FILED

MAY 25 2022

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     4:22CR298 SRC/SPM |
| | ) |
| ANTHONY "TONY" WEAVER, SR., | ) |
| | ) |
| Defendant. | ) |

### INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNTS ONE - FOUR
### WIRE FRAUD

A. INTRODUCTION

At all times relevant to the Indictment:

1. The defendant, **ANTHONY "TONY" WEAVER, SR.** (hereinafter referred to as "**WEAVER**"), was the Administrative Assistant to "Jane Doe," a St. Louis County Councilwoman, and, beginning during January, 2020, served as the appointed Change Management Coordinator at the St. Louis County Justice Center. **WEAVER** also served as the longtime Committeeman of the Spanish Lake Township of St. Louis County, and served on the board of Unity PAC, a north St. Louis County political organization.

2. During May, 2020, St. Louis County, Missouri introduced the St. Louis County Small Business Relief Program (hereinafter referred to as "SBR") to award grants totaling $17.5 million to small businesses. The SBR grants were funded through the federal relief funds St. Louis County received from the CARES Act. The SBR grants were intended to provide relief to small businesses in St. Louis County that were closed during the Stay at Home Orders. Grant funds could be used to pay for the costs of business interruption as a result of business closing

1

during this time and to cover costs associated with reopening safely, including funding improvements for businesses to comply with social distancing guidelines. Initially, the SBR Program was to award a maximum total of $2.5 million in grants per County Council District to businesses that needed financial relief the most, based upon recommendations received from the Council member of each District. Each qualifying business was eligible to receive up to $15,000 in SBR grant funds. Small business applications and Council member recommendations were originally due to be submitted to St. Louis County by June 1, 2020.

3. An individual whose identity is known to the Grand Jury (hereinafter referred to as "John Smith"), was the owner and operator of several small businesses located in St. Louis County, including a gasoline station, a convenience mart, a supermarket, a laundromat, and an automobile mechanic shop.

B.  SCHEME TO DEFRAUD

4. Beginning in or about May, 2020, and continuing through in or about December, 2020, in the Eastern District of Missouri and elsewhere, defendant,

**ANTHONY "TONY" WEAVER, SR.,**

along with others known and unknown to the Grand Jury, devised, intended to devise, and knowingly participated in a scheme to defraud and obtain money from St. Louis County, Missouri through the St. Louis County Small Business Relief Program by means of materially false and fraudulent pretenses, representations, and promises.

5. It was a part of the scheme that, on or about May 6, 2020, **WEAVER** met with John Smith and advised John Smith about the SBR grant program. **WEAVER** advised John Smith that **WEAVER** and Jane Doe, the Council member in the District where **WEAVER** believed John Smith's businesses were located, needed to know the names of each of John Smith's

businesses in order to ensure that those SBR applications would be approved and funded by St. Louis County.

> **WEAVER**: "But she need to know, and I need to know who those names are when they come up for approval then we can say yes, yes, yes."
>
> . . . . .
>
> **WEAVER**: "It's a committee of people, along with myself…a team of people make a decision together…but it doesn't matter, [Jane Doe] makes the final decision on what happens….I just have to know the names of the different companies so when it comes up I tell [Jane Doe]…."

**WEAVER** and John Smith discussed how many businesses John Smith owned, and how much each would receive in SBR grant funds.

> **WEAVER**: "$15,000 each business.  That's a lot of money when you have four different businesses in one District.  You're up to 65, $70,000."
>
> John Smith:  "There's the mechanic shop, the laundromat, supermarket, gas station, construction company, and Shepley.  That's six.  Six businesses."
>
> **WEAVER**: "You get $90,000, sir….That's $90,000.  That's money, sir….as long as they put in different names."

**WEAVER** told John Smith that he would type up the applications for John Smith's businesses, and advised John Smith that even though he was no longer the Administrative Assistant to Jane Doe, he could make sure the SBR applications were approved.

> **WEAVER**: "I'll just bring my laptop down here and we can submit them all at one time….It goes through [Jane Doe's] office.  They can't really function that well without me,  ok?  Trust me. I got it.  They're going to do what I tell them to do."

6.      It was a further part of the scheme that on May 7, 2020, **WEAVER** met with John Smith and completed and submitted an SBR grant application for one of John Smith's businesses, a laundromat.  In completing the SBR grant application, **WEAVER** made false representations that the laundromat had been closed for a period of time and the business had to lay off employees

3

as a result of the Covid-19 pandemic when, in fact, the laundromat had not closed at all and no employees were laid off.

> **WEAVER**: "Did you have any business interruption during the Corona for the laundromat?"
>
> John Smith: "I don't think so."
>
> **WEAVER**: "Well, you couldn't pay your light bill, your gas bill, heating bill…Did it have any impact to your knowledge during Corona since it started in January?"
>
> John Smith: "No, we were really busy."
>
> **WEAVER**: "You don't want to say that."
>
> John Smith: "Ok."
>
> **WEAVER**: "You want to let them think you was closed, you had to lay off one of your employees…."

**WEAVER** and John Smith discussed that they would split any SBR grant funds which John Smith's businesses received.

> John Smith: "When the money comes in…we split it….You tell me how we're gonna split it.  Ok?"
>
> **WEAVER**. "There's so much damn money around St. Louis County, it's crazy."
>
> John Smith: "We need to get some of that…."
>
> **WEAVER**: "Uh huh.  Everything they've got over there we need to get some of…that's my attitude."

After **WEAVER** completed and submitted the false SBR grant application for John Smith's laundromat, **WEAVER** agreed to meet with John Smith at a later date in order to complete and submit SBR grant applications for more of John Smith's businesses.

      7.    It was a further part of the scheme that on May 10, 2020, **WEAVER** met again with John Smith and completed and submitted a false SBR grant application for another of John Smith's businesses, a supermarket.  In completing the SBR

4

grant application, **WEAVER** made false representations that the supermarket had been closed for a period of time and the business had to lay off employees as a result of the Covid-19 pandemic when, in fact, the supermarket had not closed at all, and had not laid off any employees.

> **WEAVER**: "Did you have to lay anybody off?"
>
> John Smith: "No."
>
> **WEAVER**: "You cut anybody's hours?"
>
> John Smith: "No."
>
> **WEAVER**: "Yes."
>
> John Smith: "Okay."
>
> **WEAVER**: "…was closed for business during the stay at home order, 'yes.'"
>
> John Smith: "We were open."
>
> **WEAVER**: "I know, but you were closed at some point in time."

**WEAVER** also discussed the need to use different email addresses for each of the SBR grant applications in order to conceal the true ownership by John Smith.

> **WEAVER**: "Just make sure – I think we need to have different email addresses (on the applications)."
>
> John Smith: "Ok, I got you…why?"
>
> **WEAVER**: "Because they're gonna lead back to…ownership…but you only have one email address on it."

**WEAVER** and John Smith also discussed the fact that they would split any SBR grant funds obtained through submission of the applications.

> John Smith: "That's my money and your money."
>
> **WEAVER**: "Right."

8. It was a further part of the scheme that on May 14, 2020, **WEAVER** met again with John Smith and completed false SBR grant applications for two more of John Smith's

5

businesses, a convenience store, and the supermarket which **WEAVER** had already made an application for, but listed at a different address on this additional application. During this meeting, **WEAVER** told John Smith he needed to use a different email account on the applications because the County would be reviewing the documents and **WEAVER** did not want to connect John Smith to more than one company, which would disqualify John Smith since an owner could only apply for one small business grant. In completing the SBR grant applications, **WEAVER** made false representations that these two businesses had been closed for a period of time and the businesses had to lay off employees as a result of the Covid-19 pandemic when, in fact, neither the convenience store nor the supermarket had been closed at all, and neither business had laid off any employees.

    **WEAVER**:    "So you were not closed…."

    John Smith:    "Not even a second."

    **WEAVER**:    "Can you say you were closed a couple days?"

    John Smith:    "If that's what you need to do. Make it look stronger, go ahead."

**WEAVER** advised John Smith that in the SBR application John Smith could not be shown as owning 25% or more of any two businesses which had submitted an SBR grant application, and **WEAVER** discussed the need to falsely conceal John Smith's ownership in the multiple businesses they were submitting SBR grant applications for.

    **WEAVER**:    "Do you own 25% or more in [the supermarket]?"

    John Smith:    "I do. I do. 25%. I own more…."

    **WEAVER**:    "Does it show anywhere in paperwork that you've got 25% ownership?"

    John Smith:    "No."

    **WEAVER**:    "Ok. So we'll say you don't."

After **WEAVER** completed all of the information for the application, including the "planned use" for the SBR money, **WEAVER** read aloud questions to John Smith, warnings contained within the application prior to final signature and submission. One of those attestations involved any potential conflict of interest to be sure the applicant did not have a conflict of interest with any St. Louis County employee.

>    **WEAVER**: "Conflict of interest…as elected official, you know a relative of somebody in there, yeah, me, but we didn't tell them that" (answered "NO" on application).

During this meeting, **WEAVER** discussed completing and submitting an application for John Smith's convenience store. **WEAVER** did not want to use his own cellular telephone to submit the new application to St. Louis County for fear that St. Louis County officials would see that the application had been submitted from **WEAVER's** telephone.

>    **WEAVER**:   "I don't want to do it from my phone."
>
>    John Smith:   "Why?"
>
>    **WEAVER**:   "Because I work for St. Louis County."
>
>    John Smith   "That's a county phone?"
>
>    **WEAVER**:   "No.   It's my personal phone."
>
>    John Smith:   "They look into it?"
>
>    **WEAVER**:   "I don't know what they could do.   I don't trust St. Louis County."
>
>    John Smith:   "Really?"
>
>    **WEAVER**:   "Yes.   They're trying to get me on something, brother.   I'm too powerful, brother…."
>
>    . . . . .
>
>    **WEAVER**:   "I don't want to do it from my phone because St. Louis County may be able to see its coming from Tony Weaver's phone.   You can do it from your phone.   I sent you a link."

7

**WEAVER** then proceeded to complete the false SBR grant application for the convenience store. During this meeting, **WEAVER** and John Smith again discussed the fact that they would split any grant funds received from the numerous false SBR grant applications.

    John Smith:    "That's four or five businesses, man."

    **WEAVER**:    "I know"

    John Smith:    "Times fifteen."

    **WEAVER**:    "Right."

    John Smith:    "We splitting."

    **WEAVER**:    "I like that."

    John Smith:    "We splitting the money."

    **WEAVER**:    "Right."

**WEAVER** submitted both of these false SBR grant applications the next day, on May 15, 2020.

    9.    As a further part of the scheme, on May 21, 2020, **WEAVER** and John Smith discussed the SBR grant applications **WEAVER** had submitted for John Smith. **WEAVER** told John Doe that the County review of applications would begin Tuesday, May 27, 2020.

    **WEAVER**:    "They're just gonna be evaluating all the contracts and seeing who's eligible, who's not eligible."

    . . . . .

    John Smith:    "How many applications did we submit?"

    **WEAVER**:    "Four."

**WEAVER** and John Smith further discussed how to split the proceeds from any SBR grant funds received.

    **WEAVER**:    "You know you can't give me no check."

    . . . . .

    **WEAVER**:    "I don't want you to do that (make a campaign contribution in John Smith's or John Smith's companies' names) because then that sheds the light on

8

you giving to [Jane Doe] or Tony….Because we've got to turn it into the government."

Later in the same meeting, John Smith told **WEAVER** again the stores were not closed, despite reporting them closed for the SBR application. John Smith discussed what he would say if someone asked him about the application, and then told **WEAVER** he would give [Jane Doe] money for her support.

> **WEAVER**: "I hope this place is not bugged…that's how (former St. Louis County Executive Steve) Stenger got caught."

10. As a further part of the scheme, on May 29, 2020 **WEAVER** and John Smith met and discussed the SBR grant applications. **WEAVER** acknowledged that in addition to John Smith, he had helped ten other individuals apply for SBR grant funds.

> John Smith: "How many people applied for [Jane Doe's] money?"
>
> **WEAVER**: "About 150 people."
>
> John Smith: "How many people did you help out?"
>
> **WEAVER**: "Ten."  (**WEAVER** then identified the other ten companies)  But see, they don't believe in giving me money.  Only two of them believe in, like, 'OK, take care of me, Tony, and I'll get you.'   The other people just want to like get stuff for free.  'Oh, Tony, thanks, really appreciate it.'   And when they get in trouble they want to call me; 'hey man, I ain't got time, I'm busy.'"
>
> John Smith: "Were you up front with them?"
>
> **WEAVER**: "Oh, yeah.  I told them.  If we're going to do this, I said, you're going to have to pay me to do this."
>
> John Smith: "[C.K.], how much did he give you?"
>
> **WEAVER**: "He told me, 'give me a number.'"
>
> John Smith: "Did you give him a number?"
>
> **WEAVER**: "No…when the money comes in I'll give him a number."
>
> John Smith: "What's the number?"
>
> **WEAVER**: I don't know, I haven't thought about it yet."

9

John Smith: "None of them is better than me, Tony."

WEAVER: "No, not at all, I already know brother. You top of the chain. When you call me to do something, I'm there man because I already know, man. Those other people want stuff for free all the time."

John Smith: "We're a team, my brother."

WEAVER: "Absolutely."

11. As a further part of the scheme, **WEAVER** and John Smith met on June 29, 2020 and discussed the SBR grant applications. **WEAVER** advised John Smith that, unbeknownst to him, three of John Smith's businesses which they submitted SBR grant applications for are not in Jane Doe's District. **WEAVER** advised John Smith that he can "work with" the other Council Member's Administrative Assistant to make sure John Smith's SBR grant applications are accepted and funded. Once again, **WEAVER** and John Smith discussed that they will split any SBR grant funds John Smith receives.

John Smith: "Whenever the money comes in, we're going to split."

WEAVER: "I know."

John Smith: "Right, my brother?"

WEAVER: "Right, exactly."

Further, on July 23, 2020, **WEAVER** and John Smith discussed the SBR grant applications. The two discussed again the fact that the applications they had submitted were false in that John Smith's businesses had not closed due to Covid-19.

WEAVER: "How much did it cost to open your doors? But you didn't close."

12. As a further part of the scheme, **WEAVER** and John Smith met on December 15, 2020 and discussed the SBR grant applications. **WEAVER** advised John Smith that all the SBR grant funds had been paid out.

WEAVER: "All the stimulus check money's gone, they don't have any more to generate."

10

. . . . .

John Smith:   "Your guy [C.K.], did he give you anything?"

**WEAVER**:   "$300."

John Smith:   "That's ridiculous."

**WEAVER**:   "It is.   All the work, all the phone calls.   All the extra work I had to do to really help him."

Further, on December 19, 2020, **WEAVER** again advised John Smith that there were no more SBR grant funds available.

**WEAVER**:   "[Erica] says, Cares Act money is gone.   They've got some more money coming in January…We can be on top of that."

. . . . .

**WEAVER**: "We have to wait until January because another pot of money's coming in January. And that might be $20,000 a piece.   So that's what's going on, man."

John Smith:   "So, what are we gonna do now?"

**WEAVER**:   "Wait until some more money comes in.   Only person I know got paid, that's [C.K.], he gave me $300, maybe 4…So, we're gonna have to wait and see what else is out there."

Ultimately, despite submitting the false SBR applications to St. Louis County, none of John Doe's businesses received SBR funds.

C. <u>THE WIRES</u>

13.   On or about the dates listed below, within the Eastern District of Missouri and elsewhere, for the purpose of executing the above-described scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and in attempting to do so, the defendant did knowingly cause to be transmitted by means of wire

11

communication in and affecting interstate commerce, certain writings, signs, and signals, via the internet, including false SBR grant applications submitted to St. Louis County as detailed below:

| COUNT | DATE | AMOUNT | RECIPIENT OF APPLICATION |
|---|---|---|---|
| 1 | May 7, 2020 | $15,000.00 | St. Louis County, Missouri |
| 2 | May 10, 2020 | $15,000.00 | St. Louis County, Missouri |
| 3 | May 15, 2020 | $15,000.00 | St. Louis County, Missouri |
| 4 | May 15, 2020 | $15,000.00 | St. Louis County, Missouri |

All in violation of Title 18, United States Code, Sections 2, 1343, and 1349.

A TRUE BILL.


_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney


_____
HAL GOLDSMITH, #32984(MO)
Assistant United States Attorney