UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
    Plaintiff,             )
                                )
v.                              )   No. 4:22-CR-298 SRC
                                )
ANTHONY "TONY" WEAVER, SR.,      )
                                )
                                )
    Defendant.             )

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant Anthony "Tony" Weaver, Sr., represented by defense counsel Timothy Smith, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri and Assistant U.S. Attorney Hal Goldsmith of said Office. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Counts 1 through 4 of the Indictment, the United States agrees that no further federal prosecution will be brought in this District relative to the defendant's scheme to defraud and obtain money from St. Louis County, Missouri through its

1

Small Business Relief Program by means of materially false and fraudulent pretenses, representations and promises during the period May, 2020 through December, 2020, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

## 3. ELEMENTS:

As to Counts 1 through 4, the defendant admits to knowingly violating Title 18, United States Code, Section 1343, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1. The defendant voluntarily and intentionally devised and participated in a scheme to defraud and to obtain moneys from St. Louis County, Missouri through its Small Business Relief Program by means of material false representations and promises;

2. The defendant did so with intent to defraud; and,

3. The defendant used or caused to be used an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme.

2

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

The defendant, **ANTHONY "TONY" WEAVER, SR.** (hereinafter referred to as **"WEAVER"**), was the Administrative Assistant to "Jane Doe," a St. Louis County Councilwoman, and, beginning during January, 2020, served as the appointed Change Management Coordinator at the St. Louis County Justice Center. **WEAVER** also served as the longtime Committeeman of the Spanish Lake Township of St. Louis County, and served on the board of Unity PAC, a north St. Louis County political organization.

During May, 2020, St. Louis County, Missouri introduced the St. Louis County Small Business Relief Program (hereinafter referred to as "SBR") to award grants totaling $17.5 million to small businesses. The SBR grants were funded through the federal relief funds St. Louis County received from the CARES Act. The SBR grants were intended to provide relief to small businesses in St. Louis County that were closed during the Stay at Home Orders. Grant funds could be used to pay for the costs of business interruption as a result of business closing during this time and to cover costs associated with reopening safely, including funding improvements for businesses to comply with social distancing guidelines. Initially, the SBR Program was to award a maximum total of $2.5 million in grants per County Council District to businesses that needed financial relief the most, based upon recommendations received from the Council member of each District. Each qualifying business was eligible to receive up to $15,000 in SBR grant funds. Small business

3

applications and Council member recommendations were originally due to be submitted to St. Louis County by June 1, 2020.

An individual, (hereinafter referred to as "John Smith"), was the owner and operator of several small businesses located in St. Louis County, including a gasoline station, a convenience mart, a supermarket, a laundromat, and an automobile mechanic shop.

Beginning in or about May, 2020, and continuing through in or about December, 2020, **WEAVER**, along with others, devised, intended to devise, and knowingly participated in a scheme to defraud and obtain money from St. Louis County, Missouri through the St. Louis County Small Business Relief Program by means of materially false and fraudulent pretenses, representations, and promises.

On or about May 6, 2020, **WEAVER** met with John Smith and advised John Smith about the SBR grant program. **WEAVER** advised John Smith that **WEAVER** and Jane Doe, the Council member in the District where **WEAVER** believed John Smith's businesses were located, needed to know the names of each of John Smith's businesses in order to ensure that those SBR applications would be approved and funded by St. Louis County.

> **WEAVER**: "But she need to know, and I need to know who those names are when they come up for approval then we can say yes, yes, yes."
>
> . . . . .
>
> **WEAVER**: "It's a committee of people, along with myself…a team of people make a decision together…but it doesn't matter, [Jane Doe] makes the final decision on what happens….I just have to know the names of the different companies so when it comes up I tell [Jane Doe]…."

**WEAVER** and John Smith discussed that John Smith owned six businesses and, therefore, he could receive $15,000 for each business through the SBR Program.

4

**WEAVER** told John Smith that he would type up the applications for John Smith's businesses, and advised John Smith that even though he was no longer the Administrative Assistant to Jane Doe, he could make sure the SBR applications were approved.

> **WEAVER**: "I'll just bring my laptop down here and we can submit them all at one time....It goes through [Jane Doe's] office. They can't really function that well without me, ok? Trust me. I got it. They're going to do what I tell them to do."

It was a further part of the scheme that on May 7, 2020, **WEAVER** met with John Smith and completed and submitted an SBR grant application for one of John Smith's businesses, a laundromat. In completing the SBR grant application, **WEAVER** made false representations that the laundromat had been closed for a period of time and the business had to lay off employees as a result of the Covid-19 pandemic when, in fact, the laundromat had not closed at all and no employees were laid off.

> **WEAVER**: "Did you have any business interruption during the Corona for the laundromat?"
>
> John Smith: "I don't think so."
>
> **WEAVER**: "Well, you couldn't pay your light bill, your gas bill, heating bill...Did it have any impact to your knowledge during Corona since it started in January?"
>
> John Smith: "No, we were really busy."
>
> **WEAVER**: "You don't want to say that."
>
> John Smith: "Ok."
>
> **WEAVER**: "You want to let them think you was closed, you had to lay off one of your employees...."

**WEAVER** and John Smith discussed that they would split any SBR grant funds which John Smith's businesses received.

John Smith: "When the money comes in…we split it….You tell me how we're gonna split it. Ok?"

**WEAVER**. "There's so much damn money around St. Louis County, it's crazy."

John Smith: "We need to get some of that…."

**WEAVER**: "Uh huh. Everything they've got over there we need to get some of…that's my attitude."

It was a further part of the scheme that on May 10, 2020, **WEAVER** met again with John Smith and completed and submitted a false SBR grant application for another of John Smith's businesses, a supermarket. In completing the SBR grant application, **WEAVER** made false representations that the supermarket had been closed for a period of time and the business had to lay off employees as a result of the Covid-19 pandemic when, in fact, the supermarket had not closed at all, and had not laid off any employees.

**WEAVER**: "Did you have to lay anybody off?"

John Smith: "No."

**WEAVER**: "You cut anybody's hours?"

John Smith: "No."

**WEAVER**: "Yes."

John Smith: "Okay."

**WEAVER**: "…was closed for business during the stay at home order, 'yes.'"

John Smith: "We were open."

**WEAVER**: "I know, but you were closed at some point in time."

**WEAVER** also discussed the need to use different email addresses for each of the SBR grant applications in order to conceal the true ownership by John Smith.

6

**WEAVER** and John Smith again discussed the fact that they would split any SBR grant funds obtained through submission of the applications.

John Smith: "That's my money and your money."

**WEAVER**: "Right."

It was a further part of the scheme that on May 14, 2020, **WEAVER** met again with John Smith and completed false SBR grant applications for two more of John Smith's businesses, a convenience store, and the supermarket which **WEAVER** had already made an application for, but listed at a different address. During this meeting, **WEAVER** told John Smith he needed to use a different email account on the applications because the County would be reviewing the documents and **WEAVER** did not want to connect John Smith to more than one company, which would disqualify John Smith since an owner could only apply for one small business grant. In completing the SBR grant applications, **WEAVER** made false representations that these two businesses had been closed for a period of time and the businesses had to lay off employees as a result of the Covid-19 pandemic when, in fact, neither the convenience store nor the supermarket had been closed at all, and neither business had laid off any employees.

**WEAVER**: "So you were not closed...."

John Smith: "Not even a second."

**WEAVER**: "Can you say you were closed a couple days?"

John Smith: "If that's what you need to do. Make it look stronger, go ahead."

**WEAVER** advised John Smith that in the SBR application John Smith could not be shown as owning 25% or more of any two businesses which had submitted an SBR grant application, and

**WEAVER** discussed the need to falsely conceal John Smith's ownership in the multiple businesses they were submitting SBR grant applications for.

> **WEAVER**: "Do you own 25% or more in [the supermarket]?"

> John Smith: "I do. I do. 25%. I own more...."

> **WEAVER**: "Does it show anywhere in paperwork that you've got 25% ownership?"

> John Smith: "No."

> **WEAVER**: "Ok. So we'll say you don't."

During this meeting, **WEAVER** discussed completing and submitting an application for John Smith's convenience store. **WEAVER** did not want to use his own cellular telephone to submit the new application to St. Louis County for fear that St. Louis County officials would see that the application had been submitted from **WEAVER's** telephone.

> **WEAVER**: "I don't want to do it from my phone."

> John Smith: "Why?"

> **WEAVER**: "Because I work for St. Louis County."

> John Smith "That's a county phone?"

> **WEAVER**: "No. It's my personal phone."

> John Smith: "They look into it?"

> **WEAVER**: "I don't know what they could do. I don't trust St. Louis County."

> John Smith: "Really?"

> **WEAVER**: "Yes. They're trying to get me on something, brother. I'm too powerful, brother...."

. . . . .

8

**WEAVER**: "I don't want to do it from my phone because St. Louis County may be able to see its coming from Tony Weaver's phone. You can do it from your phone. I sent you a link."

**WEAVER** then proceeded to complete the false SBR grant application for the convenience store. During this meeting, **WEAVER** and John Smith again discussed the fact that they would split any grant funds received from the numerous false SBR grant applications.

John Smith:     "We splitting."

**WEAVER**: "I like that."

John Smith: "We splitting the money."

**WEAVER**: "Right."

**WEAVER** submitted both of these false SBR grant applications the next day, on May 15, 2020.

On May 21, 2020, **WEAVER** and John Smith discussed the SBR grant applications **WEAVER** had submitted for John Smith. **WEAVER** told John Doe that the County review of applications would begin Tuesday, May 27, 2020. **WEAVER** and John Smith further discussed how to split the proceeds from any SBR grant funds received in order to conceal their relationship.

**WEAVER**: "You know you can't give me no check."

. . . . .

**WEAVER**: "I don't want you to do that (make a campaign contribution in John Smith's or John Smith's companies' names) because then that sheds the light on you giving to [Jane Doe] or Tony….Because we've got to turn it into the government."

Later in the same meeting, **WEAVER** discussed his concern that their fraud scheme would be discovered.

**WEAVER**: "I hope this place is not bugged…that's how (former St. Louis County Executive Steve) Stenger got caught."

9

**WEAVER** and John Smith met on June 29, 2020 and discussed the SBR grant applications. **WEAVER** advised John Smith that, unbeknownst to him, three of John Smith's businesses which they submitted SBR grant applications for were not in Jane Doe's District. **WEAVER** advised John Smith that he can "work with" the other Council Member's Administrative Assistant to make sure John Smith's SBR grant applications are accepted and funded. Once again, **WEAVER** and John Smith again discussed that they will split any SBR grant funds John Smith receives.

John Smith: "Whenever the money comes in, we're going to split."

**WEAVER**: "I know."

John Smith: "Right, my brother?"

**WEAVER**: "Right, exactly."

Further, on July 23, 2020, **WEAVER** and John Smith discussed the SBR grant applications. The two discussed again the fact that the applications they had submitted were false in that John Smith's businesses had not closed due to Covid-19.

**WEAVER**: "How much did it cost to open your doors? But you didn't close."

**WEAVER** and John Smith met on December 15, 2020 and discussed the SBR grant applications. **WEAVER** advised John Smith that all the SBR grant funds had been paid out. WEAVER also acknowledged that he had received a payment from one other individual.

**WEAVER**: "All the stimulus check money's gone, they don't have any more to generate."

. . . . .

John Smith: "Your guy [C.K.], did he give you anything?"

**WEAVER**: "$300."

John Smith: "That's ridiculous."

10

**WEAVER**: "It is. All the work, all the phone calls. All the extra work I had to do to really help him."

Ultimately, despite **WEAVER** submitting the false SBR applications to St. Louis County, none of John Doe's businesses received SBR funds.

On or about the dates listed below, within the Eastern District of Missouri and elsewhere, for the purpose of executing his scheme to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and in attempting to do so, the defendant did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, and signals, via the internet, including false SBR grant applications submitted to St. Louis County as detailed below:

| COUNT | DATE | AMOUNT | RECIPIENT OF APPLICATION |
|:---:|:---:|:---:|:---:|
| 1 | May 7, 2020 | $15,000.00 | St. Louis County, Missouri |
| 2 | May 10, 2020 | $15,000.00 | St. Louis County, Missouri |
| 3 | May 15, 2020 | $15,000.00 | St. Louis County, Missouri |
| 4 | May 15, 2020 | $15,000.00 | St. Louis County, Missouri |

## 5. STATUTORY PENALTIES:

The defendant fully understands that, as to each of Counts 1 through 4, the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than 20 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

## 6. U.S. SENTENCING GUIDELINES: 2021 MANUAL:

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal

11

History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

**a. Chapter 2 Offense Conduct:**

**(1) Base Offense Level:** The parties agree that the base offense level is 7, as found in Section 2B1.1(a)(1).

**(2) Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

6 levels are added because the intended loss was more than $40,000, but not more than $95,000, pursuant to Section 2B1.1(b)(1)(D);

**b. Chapter 3 Adjustments:**

**(1) Abuse of Position of Trust:** It is the United States' position that 2 levels are added because the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, pursuant to Section 3B1.3. It is the Defendant's position that 2 levels should not be added, because the defense does not believe that the Defendant violated or abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.

**(2) Acceptance of Responsibility:** The parties agree that 2 levels should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said

12

evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**(3) Other Adjustments:** The parties agree that the following additional adjustments apply: None.

**c. Other Adjustments/Disputed Adjustments:** None.

**d. Estimated Total Offense Level:** The United States estimates that the Total Offense Level is 13. Defendant estimates that the Total Offense Level is 11.

**e. Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f. Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, either the position taken by the United States or the position taken by the Defendant, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

14

## 8. OTHER:

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

**b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

**c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished

**d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $400, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The defendant agrees to provide full restitution to all victims of all charges in the indictment.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or

17

indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant

understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring.

October 21, 2022
_____
Date

_____
HAL GOLDSMITH
Assistant United States Attorney

10-21-22
_____
Date

_____
ANTHONY "TONY" WEAVER, SR.
Defendant

10-21-22
_____
Date

_____
TIMOTHY SMITH
Attorney for Defendant